UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RICHARD MALLARD,<br><br>               Plaintiff,<br><br>v.<br><br>BATTELLE ENERGY ALLIANCE, LLC,<br><br>          Defendants. | Case No. 4:12-cv-00587-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court is defendant's Motion to Dismiss plaintiff's complaint. (Dkt. 5). The motion is fully briefed and at issue, and the Court has determined that oral argument would not significantly assist the decisional process. Accordingly, the Court will resolve the motion without a hearing. Having thoroughly considered the pleadings, the Court will grant the motion, though it will allow plaintiff the opportunity to amend his complaint.

## BACKGROUND

Plaintiff Richard Mallard worked in the fire department at the Idaho National Laboratory for approximately 25 years.  In early 2005, defendant Battelle Energy Alliance, LLC began operating part of the lab.  At that time, Mallard became a Battelle employee.

Roughly three years before Battelle began operating the lab, Mallard contracted meningitis.  He had very high fevers and was hospitalized for several days.  After recovering, Mallard returned to work, but he noticed a few difficulties with some tasks that he used to be able to easily perform, like calculating math in his head.  Mallard saw a doctor, who concluded that although the meningitis and high fevers had caused some impairments, Mallard could still perform his job.

Mallard attempted to discuss the impairments with his manager, David Stonhill, but Stonhill refused to listen; instead he placed "unreasonable restrictions" on Mallard and, over the years, increased Mallard's workload so significantly that it became impossible for him to complete his work.

In mid to late 2008, Mallard complained to Battelle management, and Mallard and Stonhill began working with Battelle's Employee Assistance Program.  Stonhill, however, eventually stopped attending.

On February 2, 2009, Mallard was summoned to Battelle's Human Resources office, where he was told that Battelle suspected he had a mental illness.  Human Resources personnel then took Mallard's access badge and required him to undergo a limited physical assessment by the on-site physician, Dr. Johns.  Dr. Johns told Mallard that Battelle was requiring him to get a neuropsychiatric evaluation from a doctor Battelle had selected, Dr. Theresa Ross.  The same day, Battelle placed Mallard on unpaid administrative leave and required him to fill out short-term disability paperwork.

Mallard met with Dr. Ross twice, once on March 31, 2009 and again on April 2,

2009.  Dr. Ross opined that Mallard was capable of performing his job, although she

suggested a few accommodations.  For example, she recommended that Mallard multi-

task less and use written reminders to perform complex tasks more efficiently.

Despite Dr. Ross' opinion, Battelle refused to allow Mallard to return to work.

When Mallard asked about returning to work, Battelle insisted that he obtain a "Return to

Work" letter from his personal physician.  Of course, Mallard's personal physician had

never said he could not work in the first place.  Also, while he was on this forced unpaid

leave, Battelle sent a letter to Mallard informing him that he might be terminated without

further notice because he had accumulated so much time off without pay.

Meanwhile, back at the lab, in Mallard's absence, some Battelle employees were

apparently telling Mallard's co-workers that he had psychological problems.  One of

Mallard's co-workers said he had heard that Mallard's cheese had slipped off his cracker.

Mallard believes this is a euphemism for mental illness.

In July 2009, some five and one-half months after he was placed on administrative

leave, Mallard returned to work.  The same day he returned to work, Battelle asked

Mallard to report to HR to discuss his job performance.  HR required Mallard to sign a

Performance Improvement Plan, that included a description of what Mallard describes as

"supposed 'specific performance criteria' that were not being met."  *Compl.*  ¶ 36.  This

plan did not mention any of the accommodations Dr. Ross had recommended.  Battelle

also told Mallard that he must "continue to meet with [Battelle's] Employee Assistance

Program."  *Id.* ¶ 37.

In September 2009, Mallard and his lawyer met with Battelle in an attempt to resolve the requested accommodations, back pay, and the performance improvement plan.  These attempts were unsuccessful and on April 19, 2010,[1] Mallard filed separate charges of discrimination with the Idaho Human Rights Commission and the Equal Employment Opportunity Commission.

Roughly eighteen months later, in September 2011, Mallard took an early retirement, though he had hoped to finish his career at Battelle.  He received right-to-sue letters from the Idaho Human Rights Commission and the Equal Employment Opportunity Commission (EEOC) in September 2012.  He filed this action in November 2012.  In his first amended complaint, Mallard alleges four claims:  (1) violation of the Americans with Disabilities Act (the ADA) (2) violation of the Idaho Human Rights Act; (3) hostile work environment; and (4) retaliation for engaging in activity under the Idaho Human Rights Act and the ADA.

In its motion to dismiss, Battelle attacks Mallard's hostile work environment claim.  Battelle also attacks the remaining claims, but only to the extent such claims are based on alleged adverse employment acts that occurred before the relevant limitations

---

[1] The complaint says this charge was filed on April 15, 2009.  The charge itself, however, shows that it was signed on April 15 and "received"  by the Idaho Human Rights Commission on April 19.  *See* Dkt. 6.  The Court will use April 19, 2010 as the filing date, as it appears plaintiff now concedes this was the proper date.  *See, e.g., Casperson Aff.*, Dkt. 12, ¶ 16 ("My office filed a charge of discrimination on Mallard's behalf on or about April 19, 2010.").  *See generally Marder v. Lopez,* 450 F.3d 445, 448 (9th Cir. 20066) (on 12(b)(6) motion, court may consider documents "on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion").  Further, although there is a statute-of-limitations dispute, the four days at issue do not make a difference.

periods.  Finally, Battelle argues that any constructive discharge claim alleged within the complaint is barred because Mallard failed to include this charge in his administrative complaint.

## THE LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Supreme Court identified two "working principles" that underlie *Twombly* in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). First, the court need not accept as true, legal conclusions that are couched as factual allegations; Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79. Second, to survive a motion to dismiss, a complaint must state a plausible claim for relief. *Id.* at 679.

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556. "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Providing too much in the complaint may also be fatal to a plaintiff. Dismissal may be appropriate when the plaintiff has included sufficient allegations disclosing some absolute defense or bar to recovery. *See Weisbuch v. County of L.A.*, 119 F.3d 778, 783,

n.1 (9th Cir.1997) (stating that "[i]f the pleadings establish facts compelling a decision one way, that is as good as if depositions and other ... evidence on summary judgment establishes the identical facts").

A dismissal without leave to amend is improper unless it is beyond doubt that the complaint "could not be saved by any amendment." *Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 20*09) (issued two months after *Iqbal*).[1]  The Ninth Circuit has held that "in dismissals for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv., Inc.,* 911 F.2d 242, 247 (9th Cir. 19*90).  The issue is not whether plaintiff will prevail but whether he "is entitled to offer evidence to support the claims." *Diaz v. Int'l Longshore & Warehouse Union*, 474 F.3d 1202, 1205 (9th Cir. 2*007) (citations omitted).

---

[1] The Court has some concern about the continued vitality of the liberal amendment policy adopted in *Harris v. Amgen*, based as it is on language in *Conley v. Gibson*, 355 U.S. 41, 45-46 (*1957), suggesting that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim. . .." Given *Twombly* and *Iqbal*'s rejection of the liberal pleading standards adopted by *Conley,* it is uncertain whether the language in *Harris v. Amgen* has much of a life expectancy.

## ANALYSIS

### 1.    Mallard's Discrimination and Retaliation Claims

Mallard alleges that Battelle violated the ADA and the Idaho Human Rights Act. Mallard's ADA claims are subject to a 300-day[2] limitations period.  *See* 42 U.S.C. § 2000e(5)(e)(1).  His Idaho Human Rights Act claims are subject to a one-year limitations period.  *See* Idaho Code §§ 67-5907(1), 67-5908(2).

Mallard filed his administrative complaint on April 19, 2010.  Counting backwards from this date, Mallard's ADA claim is limited to adverse employment decisions that took place on or after June 23, 2009.  (June 23, 2009 is 300 days before April 19, 2010).  Mallard's Idaho Idaho Human Rights Commission Act claim is limited to adverse employment decisions that took place on or after April 19, 2009.

In moving to dismiss Mallard's ADA and Idaho Human Rights Act claims, Battelle focuses on adverse actions that occurred before April 19, 2009 and June 23, 2009.  Mallard is plainly seeking to recover for various adverse actions before these dates, including Battelle's: (1) placing Mallard on unpaid administrative leave on February 2, 2009; (2) requiring him to undergo a physical exam on February 2, 2009; and (3) requiring him to undergo a psychological assessment on March 31 and April 2, 2009; and (4) threatening to terminate him on May 27, 2009.

---

[2] The statutory provision's 300-day limit, rather than the 180-day limit, applies here because Mallard pursued a claim before the Idaho Human Rights Commission. 42 U.S.C. § 2000e–5(e)(1).

Three of these four acts occurred before both cutoff dates and are thus entirely time-barred.  *See, e.g., Cherosky v. Henderson*, 330 F.3d 1243 (9th Cir. 2003) ("claims based on discrete acts are only timely where such acts occurred within the limitations period") (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122-23 (2002)). The fourth alleged act – the May 2009 termination threat – is actionable only with respect to Mallard's Idaho Human Rights Act claim, as it happened after April 15, 2009.  That threat is not actionable in relation to Mallard's ADA claims because it happened before June 23, 2009.

The Court will therefore grant Battelle's motion to dismiss, as Mallard is improperly attempting to recover on time-barred events.  Of course, nothing would have prevented Mallard from including allegations regarding these pre-limitations-period events to provide background or context.  *See Morgan*, 536 U.S. at 113 (employees may use "prior [time-barred] acts as background evidence in support of a timely claim.").  But Mallard did not include these time-barred events as mere background; he is seeking to recover for these earlier acts.  *See, e.g., Am. Compl.*, ¶¶ 49, 53.

Mallard puts forth three arguments to revive his claims to the extent they are based on acts occurring before the relevant cutoff dates.  First, he argues that the earlier acts are timely under the Lilly Ledbetter Fair Pay Act. Second, he argues that Battelle did not take separate, discrete acts, but instead took a single, continuing act that did not end until well within the applicable limitations periods.  Third, Mallard says equitable tolling applies. The Court is not persuaded by any of these arguments.

### B.      The Lilly Ledbetter Fair Pay Act

The Lilly Ledbetter Fair Pay Act of 2009 does not apply because Mallard has not alleged a wage-discrimination claim.  That is, he is not alleging that he was denied equal pay for equal work.

Congress passed the Lilly Ledbetter Act, Pub. L. No. 11-2, 123 Stat. 5, in response to the Supreme Court's decision in *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007).  *Ledbetter* held that an employer's decision to pay the female plaintiff less than other male employees was the discriminatory act that triggered the running of the statute of limitations to file an EEOC charge.  *Id.* at 624-25.  Thus, if the female plaintiff failed to file within 180 or 300 days of the initial pay-setting decision, her claim would be time-barred.  *Id.* at 621, 628-29.

After *Ledbetter* was handed down, Congress swiftly amended Title VII to provide that that each time a plaintiff receives a discriminatory paycheck, the clock for filing a Title VII discriminatory compensation begins to run anew.  *See* 42 U.S.C. § 2000e-5(3)(A) and (B).

Mallard seeks to take advantage of the Ledbetter amendments.  Most courts addressing the issue, however – including the Third, Tenth, and D.C. Circuits – hold that the Ledbetter Act does not apply unless the plaintiff alleges wage discrimination.  *See, e.g., Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 630-31 (10th Cir. 2012) ("the Fair Pay Act did not create a 'limitations revolution for any claim somehow touching on pay'"); *Schuler v. PriceWaterhouseCoopers*, 595 F.3d 370, 374 (D.C. Cir. 2010) ("in

employment law the phrase 'discrimination in compensation' means paying different wages or providing different benefits to similarly situated employees"); *Noel v. Boeing Co.*, 622 F.3d 266, 272-73 (3d Cir. 2010) ("the plain language of the . . . [Ledbetter Act] covers compensation decisions and not other discrete employment decisions"). *But see Coppett v. Tenn. Valley Auth.*, No. CV-11-S-4227-NE, 2012 WL 362901 (N.D. Ala. Sept. 11, 2012).

The Court agrees with this conclusion based on the statutory language and legislative history of the Ledbetter Act, as well as Justice Ginsburg's dissent in *Ledbetter.*

First, regarding the statutory language, the Ledbetter Act expressly covers only "discrimination *in compensation*." 42 U.S.C. § 2000e-5(3)(A) (emphasis added). Discrimination in compensation means "paying different wages or providing different benefits to similarly situated employees." *Schuler*, 595 F.3d at 374. Thus, the Ledbetter Act cannot help Mallard because he is not alleging wage discrimination.

This conclusion is more complex than it would seem, however, because the Ledbetter Act refers not only to "discrimination in compensation," but also refers to "other" discriminatory "practices." 42 U.S.C. § 2000e-5(3)(A). But when the full Ledbetter amendment is carefully read, it becomes clear that Mallard cannot rely on the "or other practice" phrase to extend the limitations periods for his claims. This is perhaps best illustrated by the reading the Ledbetter amendment one phrase at a time, as follows:

[1] For purposes of this section, *an unlawful employment practice occurs, with respect to discrimination in compensation* in violation of this subchapter,

[2]   [a]      *when* a discriminatory compensation decision *or other practice* is adopted,

[b]      *when* an individual becomes subject to a discriminatory compensation decision *or other practice*, or

[c]      *when* an individual is affected by application of a discriminatory compensation decision *or other practice*,

including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision *or other practice*.

42 U.S.C. § 2000e5(3)(A) (paragraph divisions, numbering and emphasis added).

Congress did not include the paragraph divisions and numbering shown here.  It used a single, dense sentence.  But, linguistically, the sentence has the distinct, numbered phrases shown.  The first phrase "tells us which claims are covered by the Act (those alleging unequal pay for equal work) and the second phrase, including the 'other practice' language, tells us *when* those claims accrue for limitations purposes."  *Almond*, 665 F.3d at 1182.  *Accord Noel*, 622 F.3d at 273-74.  As a result, the "or other practice" language does not mean that every employer decision touching on pay – including the decisions Mallard complains of – are covered by the Ledbetter Act.  Rather, to take advantage of the Ledbetter Act, plaintiffs must first allege "discrimination in compensation."

This reading of the statutory language is supported by Justice Ginsburg's dissent in *Ledbetter,* as well as the Ledbetter Act's legislative history.  Both recognize that wage discrimination is fundamentally different from other forms of discrimination because it is hard for plaintiffs to know when pay discrimination is happening.  *See Ledbetter*, 550 U.S. at 645 (Ginsburg, J., dissenting); H.R. Rep. No. 110-237, at 5, 6, 17.  As Justice

Ginsburg explains, pay discrimination develops in small increments, over time and comparative pay information is hidden from employees.  "Pay disparities are thus significantly different from adverse actions 'such as termination, failure to promote, . . . or refusal to hire,' all involving fully communicated discrete acts, 'easy to identify' as discriminatory.  *Ledbetter*, 550 U.S. at 645 (Ginsburg, J., dissenting) (citing *Morgan*, 536 U.S. at 114); *see also* H.R. Rep. No. 110-237, at 6 ("While workers know immediately when they are fired, refused employment or denied a promotion or transfer, the secrecy and confidentiality associated with employees' salaries make pay discrimination difficult to detect.")

These concerns are not present in this case.  The things Mallard complains of – such as being placed on unpaid leave or being forced to undergo physical and psychiatric examinations – were not cloaked in secrecy.  They were discrete, easily identifiable, fully communicated acts.  Mallard knew what was happening as it happened.  So even though some of these decisions ultimately impacted his pay, this does not mean he has alleged a wage-discrimination claim covered by the Ledbetter Act.

### C.    The Continuing Violations Theory

Mallard also argues that the adverse employment actions he complains of are not separate, discrete acts, but instead consist of "one extended action" that began on February 2, 2009, when Mallard was placed on unpaid administrative leave and did not conclude until July 21, 2009, when Mallard returned to work.  Mallard thus concludes that his action is timely "with regard to Mallard's unpaid administrative leave and the

actions it encompasses." *Resp.*, Dkt. 11, at 18.

Mallard's argument is contrary to *National Railroad Passenger Corp. v. Morgan,* *536 U.S. 101 (2002).*  In that case, the Supreme Court explained that even if a series of discriminatory acts are related to each other, each discrete act – by itself – "starts a new clock for filing charges alleging that act." *Id.* at 113.

*Morgan* gave specific guidance as to what sorts of acts are "discrete," including: termination; failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, and wrongful accusation.  *Id.* at 114; *see also* *O'Connor v. City of Newark,* 440 F.3d 125, 127 (3d Cir. 20*06).  Based on this list, it is apparent that the acts Mallard complains of are discrete.  For example, being placed on administrative leave is similar to being wrongfully suspended.  *Cf. Conley v. Village of* *Bedford* Park, 215 F.3d 703, 710 (7th Cir. 20*00) ("The suspension was a discrete act resulting in a discrete injury to Mr. Conley.").  Similarly, being forced to undergo physical or psychiatric examinations, being threatened with termination, being forced to obtain a "return to work" authorization; and being placed on a performance improvement plan are all easily identifiable and discrete.  Mallard insists that these acts are more accurately characterized as one long, continued event, but he does not offer any persuasive explanation as to why this is so; he mainly just succeeds in showing that these acts are related to each other.  *Morgan* teaches that these sorts of events are separate. Mallards' "single-event" argument thus fails.

**MEMORANDUM DECISION AND ORDER - 13**

### D.    Equitable Tolling[3]

Lastly, the Court is not persuaded by Mallard's argument that this Court cannot properly decide Battelle's statute-of-limitations defense on a motion to dismiss. According to Mallard, the Court is obligated to "go beyond the pleadings and conduct fact finding to determine whether or not Mallard has a valid means of avoiding Battelle's statute of limitations defense." *Resp.*, Dkt. 11, at 6.

Preliminarily, Mallard is correct that a failure to timely file may be saved by equitable tolling, waiver, or equitable estoppel. *Santa Maria v. Pac. Bell*, 202 F.3d 1170, 1176 (9th Cir. 2000), *overruled on other grounds in Socop-Gonzalez v. INS*, 272 F.3d 1176 (9th Cir. 2001). But the mere existence of these saving doctrines does not automatically prevent the Court from granting a motion to dismiss. If the running of the statute of limitations "is apparent on the face of the complaint, the defense may be raised by a motion to dismiss." *See Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980). As the Ninth Circuit has explained, "[i]f the pleadings establish facts compelling a decision one way, that is as good as if depositions and other expensively obtained evidence on summary judgment establishes the identical facts." *Weisbuch v. Cnty. of L.A.*, 119 F.3d 778, 783, n.1 (9th Cir. 1997). So in this case, if the complaint – read with the required liberality – would not permit Mallard to prove that that the statute of

---

[3] In addition to arguing that equitable tolling applies, Mallard makes passing reference to equitable estoppel and waiver. But he does not meaningfully discuss these doctrines, or how they would apply here. The Court will therefore not address these arguments, other than to observe that the complaint does not allege any facts that would support their application.

limitations was tolled, then the Court may grant a motion to dismiss based on the running of the limitations period.  *See Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206-07 (9th Cir. 1995).

Under these authorities, if Mallard pleads facts showing that the limitations period has expired, he must also plead facts supporting equitable tolling, or some other saving doctrine.  Plaintiffs cannot defend a motion to dismiss by generally asserting that they might find some facts during discovery that would toll the relevant statute of limitations. Otherwise, in practice, limitations defenses could never be decided on a motion to dismiss – even when a plaintiff "pleads itself out of court" by alleging "all the ingredients of an impenetrable defense . . . ."  *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004).

Mallard has not pointed to any allegations that would support equitable tolling. Courts apply this doctrine sparingly. *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990). A plaintiff's entitlement to equitable tolling depends upon (1) his diligence in pursuing his rights; and (2) the existence of some "extraordinary circumstance" that stood in his way and thereby prevented timely filing. *Holland v. Florida*, 130 S. Ct. 2549, 2562 (2010).  Thus, equitable tolling may apply "in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Irwin*, 498 U.S. at 96.  Principles of equitable

tolling do not extend to "a garden variety claim of excusable neglect." *Irwin*, 498 U.S. at 96.

Here, Mallard's complaint does not establish his diligence or the existence of any extraordinary circumstance that prevented a timely claim. For example, he complains that he was placed on unpaid, administrative leave in February 2009, yet he did not file his administrative charge until well over a year later, in April 2010. And although he points to Battelle's mandatory ADR process to excuse his untimely filing, he apparently did nothing to initiate that process until September 2009[4] – again, well after the ADA and the Idaho Human Rights Act limitations had expired for several of the acts he contends were wrongful. *Cf. Beck v. Battelle Energy Alliance, LLC*, No. 4:12-cv-00086-BLW, 2013 WL 587902, at *3 (D. Idaho Feb. 13, 2013) (limitations period tolled where employee alleged he participated in Battelle's mandatory ADR program).

Mallard also says Battelle made the second step of the required ADR process – mediation or assisted negotiation – "futile" by taking a position contrary to Mallard's. *See Resp.*, Dkt. 11, at 19. Apparently, Battelle was saying it had no intention of paying lost wages to Mallard other than through disability insurance. Mallard disagreed with that position. But a disagreement such as this hardly makes mediation futile. The entire point of mediation is to attempt to have an objective third party resolve differences. Certainly, then, the parties' disagreement about whether Battelle should pay lost wages

---

[4] The Court will assume, for purposes of this motion only, that Mallard initiated the ADR process in September 2009, when he and his counsel met with Mallard's supervisor and Battelle's counsel. *See Am. Compl.* ¶ 37.

cannot be seen as an "extraordinary circumstance" preventing Mallard from filing a timely claim.

In sum, Mallard's complaint is facially defective to the extent it seeks to recover for actions occurring before the relevant limitations periods.  A 12(b)(6) dismissal is therefore appropriate.

**2.      Hostile Work Environment**

Mallard has also failed to allege a plausible hostile work environment claim.

The Ninth Circuit has not explicitly recognized a claim for hostile work environment under the ADA.  *See Brown v. City of Tucson*, 336 F.3d 1181, 1190 (9th Cir. 2003) (declining to decide the issue).  Several other circuits, however, have recognized hostile work environment as a cause of action under the ADA because of the similarity between the language of the ADA and Title VII.  *See, e.g., Shaver v. Indep. Stave Co.*, 350 F.3d 716, 719-20 (8th Cir. 2003); *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 175 (4th Cir. 2001); *Flowers v. S. Reg'l Physician Servs., Inc.*, 247 F.3d 229, 233 (5th Cir. 2001).  This Court has also recognized the viability of a hostile work environment claim under the ADA.  *See Velasco v. Broadway Arctic Circle, LLC*, No. 4:11-cv-00102-BLW, 2012 WL 2505291, at *1 (D. Idaho June 28, 2012).

To state a claim of hostile work environment, Mallard must show that: (1) he is a qualified individual with disability; (2) he suffered from unwelcome harassment; (3) the harassment was based on his disability or a request for accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of his

employment and to create an abusive working environment; and (5) defendants knew or should have known of the harassment and failed to take prompt remedial action. *See Walton v. Mental Health Ass'n*, 168 F.3d 661, 667 (3d Cir. 1999) (applying Title VII hostile work environment to a claim stated under the ADA).

Mallard's claim fails on the fourth element. He has failed to allege facts showing that the alleged harassment that was sufficiently severe or pervasive enough to create "a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To determine whether the alleged harassment was sufficiently severe or pervasive, court looks at "all the circumstances, including the frequency of discriminatory conduct; its severity; whether it was physically threatening, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001) (internal quotation marks and citation omitted).

Mallard is primarily complaining about a handful of actions – the forced unpaid leave; the physical and psychiatric exams, the threat of termination; the requested return-to-work form; and the performance improvement plan – that occurred over an approximate five-month period. It is noteworthy that Mallard was not reporting to the lab during most of this time because he was on leave. Forcing Mallard to take unpaid administrative leave could theoretically create some other form of liability for Battelle, but it is difficult to say that an employee is being subjected to a hostile working environment during a time the employee is not reporting to the workplace.

Mallard also complains that his supervisor piled on too much work in the years before he was placed on administrative leave.  And, after he came back to work in July 2009, Mallard alleges that he was subjected to "unwelcome comments and gestures." Mallard does not specify any particular comment, other than hearing that someone at Battelle told other employees that Mallard's cheese had slipped off his cracker.

Considering all these alleged facts, the conduct Mallard endured in his workplace falls far short of the severe, pervasive harassment needed to support a hostile work environment claim.  *See generally* *Stevens v. County of San Mateo*, 267 Fed. Appx. 684, 685 (9th Cir. 20*08) (Ninth Circuit has "never definitively recognized an age-related hostile work environment claim" but adding that, even if such a claim is cognizable, the severe or pervasive requirement would still apply).  Two cases, in particular, illustrate this point:  *Anderson v. Reno*, 190 F.3d 930 (9th Cir. 1999), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) and *Montero v AGCO Corp.*, 192 F.3d 856, 860 (9th Cir. 19*99).

In *Anderson,* a female FBI agent "endured a host of sexually harassing incidents between 1986 and 1994," including being referred to by her supervisor as the "office sex goddess," "sexy," "gorgeous," and "the good little girl" instead of by name.  *Anderson*, 190 F.3d at 933.  One day, when Anderson entered a briefing room to present an arrest plan to her fellow agents, she found that someone had drawn a pair of breasts on an easel and titled it "Operation Cupcake."  *Id.*  When she sought assistance, her supervisor said in front of the assembled group, "This is your training bra session."  *Id.*  Anderson also

received various vulgar notes including a cartoon depicting varieties of female breasts with her initials next to an example labeled "cranberries."  Another time, a fellow agent patted her on the buttocks and commented that she was "putting on weight down there." *Id.* at 934.

In *Montero,* plaintiff was the only female employee at a parts distribution center. Over a two-year period, one supervisor called her a "butt-kiss," told her he was going to spank her, rested his chin on her shoulder, grabbed her arms until she said "ouch," and made crude gestures. 192 F.3d at 859.  Another supervisor grabbed his crotch while speaking with her, placed his face on her bottom, told her he had sexual dreams about her, asked if he could sit under her desk, put his hand on her chair as she sat down, put his hands in the air as if he was going to grab her breasts, tried to bite her neck, and knelt in front of her and tried to put his head between her knees. *Id.*  Another employee had pulled her pants up from behind by the belt loop, commented about the small size of his penis, and placed notes on her desk telling Montero to dance naked on the desk or to take off her clothes.  *Id.; see also Draper v. Coeur Rochester Inc.*, 147 F.3d 1104 (9th Cir. 1998) (female employee of mining company endured similar harassment over a two-year period).

Mallard's allegations do not rise to this level – or even close.  Further, the Ninth Circuit has held as a matter of law that more extreme factual situations than he alleges were not sufficiently severe or pervasive to support hostile work environment claims.  In *Sanchez v. City of Santa Ana*, 936 F.2d 1027 (9th Cir.1990), for example, the court

held that no reasonable jury could have found a [racially] hostile work environment despite allegations that the employer posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos, did not provide adequate police backup to Latino officers, and kept illegal personnel files on plaintiffs because they were Latino.

*Vasquez v. County of L.A.*, 349 F.3d 634, 643 (9th Cir. 2004) (discussing *Sanchez*); *see also, e.g., Kortan v. Cal. Youth Auth.*, 217 F.3d 1104 (9th Cir.2004) (no sexually "hostile work environment when, among other things, a supervisor called female employees "castrating bitches," "Madonnas," or "Regina").

Based on this precedent, Mallard's hostile work environment claim fails as matter of law.

## 3.    Constructive Discharge

In his ADA claim, Mallard alleges that one of the discrete, adverse actions Battelle took was to constructively discharge him.  Battelle contends that the Court lacks jurisdiction over any constructive discharge claim because Mallard did not include this charge in his administrative charge.  Battelle also contends that Mallard signed a release and waiver that prevents him from bringing a constructive discharge claim.

The Court cannot consider Battelle's defense based on the release and waiver agreement because any defect arising from this agreement is not disclosed on the face of the complaint.  *See generally Jones v. Bock*, 549 U.S. 199, 215 (2007) (complaint subject to a 12(b)(6) dismissal only when an affirmative defense appears on the face of the complaint).

The Court also disagrees with Battelle's suggestion that the Court lacks jurisdiction of the constructive discharge claim.  As a general rule, claims not included in an EEOC charge may not be considered by the district court.  *See B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1100 (9th Cir. 2002).  As Battelle acknowledges, however, the district court may nonetheless consider new claims if they are "like or reasonably related to" the allegations contained in the EEOC charge.  *Id.*  In determining whether Mallard's constructive discharge claim is "like or reasonably related to" the allegations in his administrative charge, "it is appropriate to consider such factors as the alleged basis of the discrimination, dates of discriminatory acts specified within the charge, perpetrators of discrimination named in the charge, and any locations at which discrimination is alleged to have occurred." *Id.*  "In addition, the court should consider plaintiff's civil claims to be reasonably related to allegations in the charge to the extent that those claims are consistent with the plaintiff's original theory of the case." *Id.*

Mallard's constructive discharge allegations are consistent with his original theory of the case – namely, that Battelle discriminated and retaliated against him because of a perceived disability.  In his administrative charge, Mallard indicated that the discrimination against him was "ongoing" and retaliatory.  As such, it seems logical that when the EEOC investigated the matter, it would have investigated the circumstances surrounding Mallard's resignation from Battelle.

Regardless, however, Mallard's constructive discharge claim fails as a matter of law.  As the Ninth Circuit has explained, if "a plaintiff fails to demonstrate the severe or

pervasive harassment necessary to support a hostile work environment claim, it will be impossible . . . to meet the higher standard of constructive discharge." *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000).  As already explained, Mallard failed to allege a plausible hostile work environment claim.  Thus, his constructive discharge claim necessarily fails.

## ORDER

**IT IS ORDERED THAT:**

1.    Defendant's Motion to Dismiss (Dkt. 5) is **GRANTED**.

2.    Plaintiff's third claim for relief – hostile work environment is **DISMISSED WITH LEAVE TO AMEND**.

3.    To the extent Plaintiff's complaint seeks to allege a constructive discharge claim, such claim is **DISMISSED WITH LEAVE TO AMEND.**

4.    To the extent Plaintiff's ADA claims are based on acts occurring before June 23, 2009, such claims are **DISMISSED WITH LEAVE TO AMEND.**

5.    To the extent Plaintiff's Idaho Human Rights Act claims are based on acts occurring before April 19, 2009, such claims are **DISMISSED WITH LEAVE TO AMEND.**

6.    Any amended complaint must be filed within 30 days.



DATED: June 6, 2013

B. Lynn Winmill
Chief Judge
United States District Court